**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AVOCADOS PLUS INC., <u>et</u> <u>al.</u>,    )
                                      )
          **Plaintiffs,**              )
                                      )
     v.                               )      **Civil Action No. 02-1798 (GK)**
                                      )
MIKE JOHANNS, Secretary of            )
Agriculture, <u>et</u> <u>al.</u>,         )
                                      )
          **Defendants.**              )
                                      )

<u>**MEMORANDUM OPINION**</u>

Plaintiffs are seven importers of Hass avocados for distribution and consumption in the United States.[1] Defendants are Mike Johanns, Secretary of Agriculture (the "Secretary"); A.J. Yates, Administrator of the Agricultural Marketing Service ("AMS"); the U.S. Department of Agriculture ("USDA"); Robert Bonner, Commissioner of Customs and Border Protection; and the U.S. Customs Service (collectively, the "Defendants"). The Jerome J. Stehly and Christina M. Stehly Living Trust of November 30, 1999 and Charley Wolk (collectively, the "Intervenors") have intervened in support of the Defendants.

Plaintiffs challenge the Hass Avocado Promotion, Research, and Information Act of 2000, 7 U.S.C. §§ 7801 <u>et</u> <u>seq.</u> (the "Avocado Act" or "Act"), alleging that it violates their First Amendment

---

[1] The individual Plaintiffs are Avocados Plus, Incorporated; LGS Specialty Sales, Limited; J & K Produce, Incorporated; J. Bonafede Company, Incorporated; J.L. Gonzalez Produce, Incorporated; La Hacienda Brands, Incorporated; and Sonora Produce, Incorporated.

rights to freedom of speech and freedom of association.

This matter is now before the Court on the Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment [Dkt. #71], the Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment [Dkt. #73], and Plaintiffs' Motion for Summary Judgment [Dkt. #74].  Upon consideration of the Motions, Oppositions, Replies, applicable case law, and the entire record herein, and for the reasons stated below, the Intervenors' Motion is **granted in part and denied in part**, the federal Defendants' Motion is **granted in part and denied in part**, and Plaintiffs' Motion is **denied**.

## I.     **BACKGROUND**[2]

Plaintiffs' effort to defeat the Avocado Act has been ongoing for nearly four years and this is the Court's third Memorandum Opinion in this case.  As such, the Court will limit its discussion here to the facts relevant to the instant Motions.  Additional recitations of the facts can be found in this Court's February 14, 2003 Memorandum Opinion [Dkt. # 28] and in the June 18, 2004 opinion by the Court of Appeals.  See Avocados Plus et al. v. Veneman et al., 370 F.3d 1243 (D.C. Cir. 2004).

### A.     **The Avocado Act**

---

[2]   Unless otherwise indicated, all facts set forth herein are taken from the Complaint or the undisputed facts presented in the parties' briefs.

Congress enacted the Avocado Act in 2000 to "(1) strengthen the position of the Hass avocado industry in the domestic marketplace and (2) maintain, develop[,] and expand markets and uses for Hass avocados in the domestic marketplace."  7 U.S.C. § 7801(b).  To achieve these goals, the Act authorizes a generic marketing campaign to be financed through a per-pound assessment on Hass avocados grown domestically or imported into the United States.[3]  Before the assessments can be levied, however, the Act requires the Secretary to hold a referendum among those producers and importers that would be required to pay them.  Id. § 7805.  If that referendum succeeds, the Act allows the Secretary to begin collecting assessments and requires the creation of a Hass Avocado Board ("HAB" or "Board") to administer the funds received.

The Secretary announced the referendum on February 19, 2002, and it passed overwhelmingly during voting that occurred between June 24 and July 12, 2002.  See 67 Fed. Reg. 56895 (Sept. 6, 2002).  Accordingly, the Board was established on September 6, 2002 and collection of the assessments started in early 2003.

The HAB is composed of twelve members, all of whom have been appointed by the Secretary, with seats divided proportionally between domestic producers and importers.  See id. § 7804(b)(2).

---

[3]  The Act sets the initial rate of assessments at $.025 per pound of avocados.  The rate may be changed but not more than once annually, and it may not exceed $.05 per pound. See 7 U.S.C. § 7804(h)(2).

It is the Board's statutory responsibility to "propose and develop (or receive and evaluate), approve, and submit to the Secretary for approval . . . plans or projects for Hass avocado promotion, industry information, consumer information, or related research." Id. § 7804(c)(6). Such efforts must be "directed toward increasing the general demand for Hass avocados in the domestic marketplace," and must be approved by the Secretary before being publicly disseminated. Id. §§ 7804(d)(2)(A)(ii) - (3).

The Board may fulfill its duties, including its mandate to promote the domestic consumption of Hass avocados, by entering into a contract with "an avocado organization established by State statute in a State with the majority of Hass avocado production in the United States." Id. § 7804(e)(1)(A); see also 7 C.F.R. § 1219.38(h). Exercising this authority, the Board contracted with the California Avocado Association (the "CAC") in 2002, giving it day-to-day responsibility for administering Avocado Act programs. The Board, and ultimately the Secretary, however, direct and control all of the CAC's activities. See 7 U.S.C. § 7804(e)(1)(B); 7 C.F.R. § 1219.51.

Much of the promotional work required by the Act is done in partnership with avocado growers' and importers' associations. Any "State organization of avocado producers established pursuant to state law," such as the CAC, is eligible to a receive a refund of 85 percent of the assessments paid by its members. 7 U.S.C. §

-4-

7804(h)(8).  Any "importers association" that is either established pursuant to state law or that meets certain requirements also applicable to the Board itself may likewise receive funding equivalent to 85 percent of its members' assessments.  Id. § 7804(h)(9).  Among the requirements the Act imposes on the Board, and thus on an association certified under this provision, is the duty to "submit to the Secretary for approval . . . plans or projects for Hass avocado promotion, industry information, consumer information, or related research."  Id. § 7804(c)(5)(B).  To date, the Mexican Hass Avocado Importers' Association ("MHAIA") and the Chilean Avocado Importers' Association have been certified to receive funds under this provision.

All assessments refunded to growers' or importers' associations must be spent on "promotion, research, consumer information, and industry information plans and projects" consistent with the Act.  Id. §§ 7804(h)(8)-(9).  The Act defines these terms with specificity, id. § 7802, and requires the Secretary's approval before any such plans and projects may be disseminated.  See 7 U.S.C. § 7804(d)(3); see also 7 C.F.R. §§ 1219.54(l), 1219.21, 1219.50.

The Secretary is required to review all advertisements and promotional materials created with Avocado Act funding, whether by the Board itself or by any eligible growers' or importers' association, and must make the final decision whether or not to use

them.  See 7 U.S.C. § 7804(d)(3); 7 C.F.R. § 1219.50(a)-(c).
Through his delegate, the Chief of the Fruit and Vegetable Research
and Promotion Branch of the AMS, the Secretary has in fact
exercised "careful oversight over all promotional programs and
materials" funded by Avocado Act assessments, whether they were
created by the Board or by a growers' or importers' association.
See Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J.
[#73], Ex. 2, Decl. of Margaret B. Irby (hereinafter "Irby Decl.")
¶ 5.

### B.   Procedural History

Plaintiffs filed this action on September 11, 2002 seeking
declaratory and injunctive relief, including an order prohibiting
the Secretary from collecting assessments under the Act.   See
Compl. at 17.  They amended their Complaint on October 23, 2003,
adding Defendants Bonner and U.S. Customs Service.  See First Am.
Compl.

On February 14, 2003, the Court denied Plaintiffs' Motion for
Preliminary Injunction, holding that the Plaintiffs did not have a
substantial likelihood of success on most of their claims –
including their freedom of speech claims – and that the balance of
harms weighed against injunctive relief.  See Avocados Plus, Inc.
et al. v. Veneman et al., No. 02-cv-1798, Mem. Op. (D.D.C. Feb. 14,
2003).  The Court also denied Defendants' and Intervenors' Motion
to Dismiss for failure to exhaust administrative remedies.  See id.

After Defendants filed a Motion to Alter or Amend the Judgment, the Court reconsidered its determination that the Act did not require Plaintiffs to exhaust their administrative remedies. The Court concluded that administrative exhaustion was, in fact, required, and that Plaintiffs could not maintain their suit without first bringing their claims before the USDA.  Accordingly, it dismissed the case on April 14, 2003.  See id. Mem. Op. (D.D.C. Apr. 14, 2003).  Plaintiffs appealed that ruling and on June 18, 2004, the Court of Appeals vacated it, holding that "while the matter is not free from doubt, . . . the language of the Avocado Act does not make exhaustion" mandatory.  See Avocados Plus, Inc. et al. v. Veneman et al., 370 F.3d 1243, 1250 (D.C. Cir. 2004). The case was subsequently remanded to this Court.

On August 11, 2004, the federal Defendants moved for a stay of all proceedings pending the Supreme Court's resolution of Veneman v. Livestock Marketing Association, a case that Defendants argued would "provide this Court with guidance as to the issues presented here."  Defs.' Mem. Requesting Stay at 1 [Dkt. #50].  The Court granted that request on October 1, 2004 and there were no further proceedings until the Supreme Court issued its Livestock Marketing opinion in May 2005.  See Johanns v. Livestock Mktg. Assoc., 544 U.S. ____, 125 S.Ct. 2055 (2005) ("Livestock Marketing").

On October 24, 2005, Plaintiffs filed their Second Amended Complaint.  In Count I, they allege that the Avocado Act infringes

their First Amendment right to free speech by, <u>inter</u> <u>alia</u>, compelling them "to pay subsidies for speech to which they object." Second Am. Compl. ¶ 54.  In Count II, Plaintiffs argue that the Act further violates their First Amendment rights by compelling them to associate with other avocado producers and distributors "to pursue statutory objectives to which they object."  <u>Id.</u> ¶ 62.

The Intervenors and the federal Defendants filed the instant Motions to Dismiss or, in the Alternative, for Summary Judgment [Dkt. #71, 73] on August 12, 2005 and August 15, 2005, respectively.  Plaintiffs filed their Motion for Summary Judgment [Dkt. #74] on August 15, 2005.

## II.  STANDARD OF REVIEW

Both the federal Defendants and the Intervenors move to dismiss Plaintiff's Complaint or, in the alternative, for summary judgment.  Pursuant to Fed. R. Civ. P. 12(b)(6), a motion to dismiss should only be granted "when it appears beyond doubt that, under any reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief." <u>Hishon v. King & Spaulding</u>, 467 U.S. 69, 73 (1984).  Because such motions "summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, [they] should be treated with the greatest of care."  <u>Haynesworth</u> <u>v. Miller</u>, 820 F.2d 1245, 1254 (D.C. Cir. 1987).  The factual allegations of the Complaint must be presumed true and liberally

construed in favor of Plaintiff.  See Shear v. Nat'l Rifle Assoc., 606 F.2d 1251, 1253 (D.C. Cir. 1979).

Where, as here, the Court must consider "matters outside the pleading[s]" to reach its conclusion, a motion to dismiss "must be treated as one for summary judgment and disposed of as provided in Rule 56."  See Fed. R. Civ. P. 12(b); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324.  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  Bias v. Advantage Intern., Inc., 905

F.2d 1558, 1561 (D.C. Cir. 1990).  It must provide "evidence that would permit a reasonable [fact-finder] to find" in its favor. <u>Laningham v. U.S. Navy</u>, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

In deciding a motion for summary judgment, a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000); <u>see also</u> <u>Washington Post Co. v. U.S. Dep't of Health and Human Servs.</u>, 865 F.2d 320, 325 (D.C. Cir. 1989).  Ultimately, a court must determine "whether the evidence . . . is so one-sided that one party must prevail as a matter of law."  <u>Anderson</u>, 477 U.S. at 251-52.

## III. ANALYSIS

### A. The Supreme Court's Decision in <u>Livestock Marketing</u> Forecloses Plaintiffs' Facial First Amendment Claims

In <u>Livestock Marketing</u>, the Supreme Court considered whether the First Amendment prohibits a congressionally-mandated program of generic advertising for the promotion of an agricultural commodity – in that case, beef.  The respondents challenged the Beef Promotion and Research Act of 1985, 7 U.S.C. §§ 2901 <u>et</u> <u>seq.</u> (the "Beef Act"), arguing that it violated their rights to freedom of speech and freedom of association.

The Beef Act, like the Avocado Act, funds a program of generic advertising through per-head assessments on cattle sales and

imports.  See Livestock Marketing, 125 S. Ct. at 2058-59.  Also, like the Avocado Act, the Beef Act is administered through a USDA-appointed Board – the "Beef Board" – that works in tandem with several state beef councils, which also receive funding under the Act both directly and through a refund scheme.  See 7 U.S.C. § 2904(8)(C).  The Secretary supervises all Beef Board activities and must approve all Beef Act advertisements prior to their publication.  See Livestock Marketing, 125 S. Ct. at 2059.  Like the Plaintiffs here, a group of dissident producers subject to the assessments challenged the Beef Act, arguing, inter alia, that it compelled them to subsidize speech with which they disagree, and to associate with producers against whom they normally compete.  See id. at 2060.

Writing for a 6-3 majority, Justice Scalia concluded that the Beef Act advertising programs constituted government speech to which the producers had no First Amendment right to object.[4]  The Court rejected respondents' argument that because the Beef Board and state beef councils play such a central role in creating and disseminating those advertisements, the government speech doctrine does not apply.  "When, as here, the government sets the overall message to be communicated and approves every word that is

_____

[4]  The Court included a lengthy analysis of the government speech doctrine which, in general, precludes citizens from challenging expressive activities by government actors or the government itself.  See Livestock Marketing, 125 S. Ct. at 2060-63.

disseminated," the Court held, "it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." Id. at 2063. In other words, when a "message . . . is from beginning to end . . . established by the federal government" it constitutes government speech even if private actors are enlisted to convey it. Id. at 2062.

The similarities between the Beef Act and the Avocado Act are obvious; in its discussion of the Beef Act, in fact, the Supreme Court lists the Avocado Act as one of several "similar programs of promotional advertising" overseen by the USDA. See Livestock Marketing, 125 S. Ct. at 2060 n.2. Nevertheless, Plaintiffs attempt to save their facial challenge by distinguishing Livestock Marketing on two grounds. First, they argue that because the Avocado Act gives the Secretary less control over the Avocado Board, and the growers' and importers' associations, than he has over the Beef Board and its allied industry groups, the government-speech doctrine is inapplicable. See Pls.' Mot. for Summ. J. at 9.[5]  Second, Plaintiffs contend that Livestock Marketing simply does not address their argument that the Avocado Act compels them to associate with other producers and importers, in violation of the First Amendment. See id. at 17-20.

_____

[5]  Because Plaintiffs fail to separately paginate their pleadings, the Court will refer to the page numbers assigned by the Electronic Case Filing System ("ECF").

1.   **The advertisements and promotional campaigns funded through the Avocado Act constitute government speech that is not subject to First Amendment challenge**

According to Plaintiffs, the Secretary exercises too little control over Avocado Act programs for the government speech doctrine to apply.  Whereas the Beef Act sets the "overarching message" for its promotional activities, and gives the Secretary tight control over the Beef Board, Plaintiffs contend that the Avocado Act is fundamentally different in that it allows the Avocado Board far more discretion to set the message for its advertisements, limits the Secretary's control over the Board, and confers much more power on outside entities like the growers' and importers' associations. See Pls.' Mot. for Summ. J. at 9-10, 12.  As a result, Plaintiffs argue, Avocado Act programs, unlike their Beef Act counterparts, more closely resemble private speech than government speech, distinguishing this case from Livestock Marketing.  See id. at 12-13.  Because the Act compels them to subsidize such speech, Plaintiffs conclude that it violates their First Amendment rights on its face.

Contrary to Plaintiffs' assertions, however, the Beef Act and the Avocado Act are identical in all relevant aspects.  First, both laws "establish the overarching message" for their respective promotional campaigns.  See Pls.' Mot. for Summ. J. at 9.  The Beef Act declares that it is "the policy of Congress" to authorize "an orderly procedure for financing . . . and carrying out a

coordinated program of promotion and research designed to strengthen the beef industry's position in the marketplace and to maintain and expand domestic and foreign uses for beef and beef products."  7 U.S.C. § 2901(b).  Likewise, in nearly identical language, the Avocado Act declares its "purpose" as authorizing

> an orderly procedure for the development and financing of an effective and coordinated program of promotion, research, industry information, and consumer information . . . that is designed to (1) strengthen the position of the Hass avocado industry in the domestic marketplace; and (2) maintain, develop, and expand markets and uses for Hass avocados in the domestic marketplace.

7 U.S.C. § 7801(b).  If anything, the Avocado Act spells out its purpose with greater specificity than the Beef Act does.

Second, the Secretary exercises the same degree of control over the Avocado Board as he does over the Beef Board.  He appoints the entire membership of both Boards to fixed terms and fills vacancies as they arise.  See 7 U.S.C. §§ 2904, 7804.  He has unfettered power to set and adjust the operating budgets of both Boards.  See id.  Most importantly for the First Amendment analysis, moreover, the Secretary must review and approve any promotion or advertisement developed by either Board before it can be disseminated to the public.  See id.; see also 7 C.F.R. §§ 1260.168(e), 1260.169; 7 U.S.C. § 7804(d)(3).

Third, and most importantly, the Avocado Act gives the Secretary the same degree of control over avocado importers' and growers' associations as the Beef Act gives him over state beef

councils.

Plaintiffs' most strenuous efforts to distinguish the Beef Act and Livestock Marketing from the Avocado Act and this case, concern the extent to which the Secretary controls outside industry groups that are enlisted to disseminate their respective promotional messages.  See Pls.' Reply at 4-10.  While the Beef Act gives the Secretary clear control over the dissemination of its message, including the promotional materials created by state beef councils, Plaintiffs maintain that the Avocado Act does not authorize such oversight of the avocado growers' and importers' associations.  See  Pls.' Mot. for Summ. J. at 10-13; Pls.' Reply at 4.  In fact, however, the two laws give the Secretary nearly identical control over the activities of the respective industry groups.

Both Acts allow private industry groups to play a critical role in their expressive mission.  The Beef Act allows the Beef Board to contract with "established national nonprofit industry-governed organizations," including state beef councils, to discharge its statutory duties.  7 U.S.C. § 2904(6).  However, the Beef Board is also required to "receive and evaluate . . . and submit to the Secretary for approval" any promotion or advertisement created by an outside entity.  7 C.F.R. § 1260.169.  Thus, even though its day-to-day operations may be contracted out, the Beef Board, and ultimately the Secretary, control all expressive activities funded by the Beef Act.   See Livestock

-15-

Marketing, 120 S. Ct. at 1059.

In indistinguishable fashion, the Avocado Act authorizes the Avocado Board to contract with "an avocado organization established by state statute in a state with the majority of Hass avocado production in the United States," in order to fulfill its statutory duties.  7 U.S.C. § 7804(e)(1)(A); 7 C.F.R. § 1219.51.  The Board exercises this authority through its association with the CAC.  If the CAC undertakes any "plan or project for promotion, industry information, consumer information, or related research" as defined by the statute, such activities must be approved by both the Board and the Secretary just as similar Beef Board contract activities must be approved by the Secretary.  7 U.S.C. § 7804(e)(1); see also id. § 7802 (defining "consumer information," "industry information," "promotion" and "research").

Specifically, in language that is identical to a Beef Act regulation cited by the Supreme Court as evidence of the Secretary's control, the Avocado Board must "receive and evaluate . . . [and] submit to the Secretary for approval" any promotional programs created by an outside entity, like the CAC, using Avocado Act funds.  7 C.F.R. § 1219.50(b) (emphasis added);[6] see also

_____

[6]  In their Reply brief, Plaintiffs argue that 7 C.F.R. §§ 1219.50, 1219.51, and 1219.54 only give the Secretary control over the Board's expressive activities, not those of any outside entity. See Pls.' Reply at 4-6.  Their interpretation of those provisions, however, is incorrect.

The first sentence of 7 C.F.R. 1219.50(b) explains that the Board may "receive and evaluate" or "on its own initiative develop

-16-

Livestock Marketing, 120 S. Ct. at 1059.  As the state beef council are barred from issuing Beef Act materials without the Secretary's approval, so too is the CAC required to secure his approval of any Avocado Act promotions.

Both Acts also include schemes that use producers' assessments to subsidize qualified promotional efforts by private industry

---

programs, plans, and projects for Hass avocado promotion . . ." 7 C.F.R. § 1219.50(b).  By drawing a distinction between projects that the Board "receive[s] and evaluate[s]" from those it "develop[s]" "on its own initiative," the regulation contemplates two sources for creation of Avocado Act materials – the Board itself, which can "develop" such material, and other entities, from which it can "receive and evaluate" avocado promotions.  In either case, such materials may be promulgated only after they are submitted to the Secretary for final approval.  Id.; see also 7 C.F.R. § 1219.50(c).

Likewise, 7 C.F.R. § 1219.51 provides that when the Board contracts with organizations like the CAC, any promotional materials created by the outside entity "shall become effective on the approval of the Secretary."  7 U.S.C. § 1219.51(b).

Finally, 7 C.F.R. § 1219.54 allows growers' and importers' associations that have been certified as meeting the requirements applicable to the Board to receive a refund equal to eighty-five percent of the assessment paid by their members.  7 U.S.C. § 7804(9).  As noted supra, one of those requirements is the duty to submit all promotional materials for the Secretary's approval. See 7 U.S.C. 7804(c)(5)(B).  The associations may use such funds to create "promotion, research, consumer information, and industry information programs, plans, and projects." 7 C.F.R. § 1219.54(l). The statute and the regulations define each of those terms to mean promotional activities authorized by the Act that require the Secretary's approval before promulgation.  See 7 U.S.C. § 7802; 7 C.F.R. § 1219.21.

Thus, on their face, these regulations clearly require the Secretary's approval for Avocado Act promotions created by outside entities. They are virtually identical, moreover, to provisions of the Beef Act and its implementing regulations that the Supreme Court found sufficient to establish the Secretary's control over state beef councils.  Accordingly, Plaintiff's argument that they apply only to the Hass Avocado Board must be rejected.

groups.[7]  The Beef Act gives a fifty percent credit to producers that support promotional campaigns by qualified state beef councils.  See 7 U.S.C. § 2904(8)(c).  As noted above, however, the Beef Board is required to "receive and evaluate" any such promotions and to  "submit [them] to the Secretary for approval" before allowing any such promotions to be disseminated.  7 C.F.R. § 1260.169.

Likewise, the Avocado Act refunds to growers' and importers' associations eighty-five percent of the assessments paid by their members if such funds are used for promotional campaigns consistent with the Act.  7 U.S.C. § 7804(h)(9)(B).  Growers' or importers' associations may only receive such funds, however, if they are "certified by the Secretary as meeting the requirements applicable to the Board" itself, id. § 7804(h)(9)(A), including the duty to "submit to the Secretary for approval . . . plans or projects for Hass avocado promotion, industry information, consumer information, or related research."  Id. § 7804(c)(5)(B); see also 7 C.F.R. § 1219.54(l) (permitting the associations to use refunded assessments on "programs, plans, and projects," which are defined in 7 C.F.R. §§ 1219.21 and 1219.50 to mean expressive activities requiring the

---

[7]  Although it is not material to the Livestock Marketing analysis, it is worth noting one factual distinction between the two programs: the Avocado Act requires producers to pay the assessments to the USDA which then refunds eight-five percent of the amount collected to the associations, while the Beef Act instead allows producers simply to withhold fifty percent of the assessments they would otherwise pay.

Secretary's approval before dissemination).

The Secretary's control over growers' and importers' associations is not merely theoretical.  The record indicates that he has diligently exercised such control throughout the program's three-year history.  According to the USDA official charged with overseeing the Act, the agency "exercises careful oversight over all promotional programs . . . prepared or approved by the Hass Avocado Board, the Mexican Hass Avocado Importers Association, and the California Avocado Commission."  Irby Decl. ¶ 5.  It does so in several ways: by sending delegates to all CAC and MHAIA meetings, where they provide feedback on promotional efforts the associations are considering; by formally reviewing and editing proposed advertisements submitted by the associations; and by granting final approval to projects determined to be consistent with the Act.[8] Id. ¶¶ 6-7.  While Plaintiffs suggest that such acts are <u>ultra vires</u>, the statutory and regulatory scheme outlined above requires the Secretary to conduct such oversight.  As matter of law and a matter of fact, therefore, the Secretary exercises tight control over the expressive activities of the growers' and importers' associations.

Thus, there is no relevant factual distinction between the Beef Act and the Avocado Act with respect to the Secretary's

---

[8]  These are the precise mechanisms the Secretary also uses to control Beef Act promotions.  <u>See</u> <u>Livestock Marketing</u>, 125 S. Ct. at 2063.

control over their respective promotional programs.  Accordingly, Livestock Marketing controls and the government speech doctrine precludes Plaintiffs' facial freedom of speech claim.  Summary judgment on that claim must be entered in Defendants' favor.

> **2. Plaintiffs' freedom of association claim fails because the Avocado Act does not require them to associate with any entity apart from the government itself**

Plaintiffs' freedom of association claim, which they insist survives Livestock Marketing, rests on their contention that the Avocado Act forces them to associate with producers against whom they compete and with whom they disagree.[9]  See Pls.' Opp'n at 10. They allege that the statute requires such association in two ways: by compelling them to support the Avocado Board, on which many of their competitors serve; and by forcing them to "join[] an

---

[9] Although Plaintiffs do not raise this point in the pending Motions, the Court earlier held that Plaintiffs had a substantial likelihood of success on their freedom of association claim because the Act "force[s] them to associate with domestic competitors who are trying to force them out of the market or with competing importers."  Avocados Plus Inc. v. Veneman, No. 02-cv-1798, Mem. Op. at 14 (D.D.C. Feb. 14, 2003).  Because the Court came to that preliminary conclusion before the Supreme Court decided Livestock Marketing, however, it is not binding now.  Under the then-governing precedents, the Court assumed that the expressive activities authorized by the Avocado Act were private in nature. It found, on that basis, that Plaintiffs could likely establish that they were unconstitutionally forced to associate with other private parties with whom they disagreed.  Livestock Marketing, however, establishes that the private entities that are enlisted to discharge Avocado Act duties become government actors for First Amendment purposes; as a result, Plaintiffs can no longer claim a First Amendment right not to associate with them.  See Livestock Marketing, 125 S. Ct. at 2063.

importers association which consists of their directly [sic]
business competitors" in order to "influence the spending of some"
of the assessments they pay. <u>See</u> Pls.' Mot. for Summ. J. at 23.

The <u>Livestock Marketing</u> respondents raised identical freedom
of association claims. <u>See</u> Brief for the Respondents at 12-16, 21-
23, <u>Veneman et al. v. Livestock Marketing Assoc. et al.</u>, Nos. 03-
1164, 03-1165 (U.S. Oct. 15, 2004). While those claims were fully
briefed and argued, the Supreme Court nevertheless found that the
"<u>dispositive</u>" question in the case was "whether the generic
advertising at issue is the Government's own speech and therefore
is exempt from First Amendment scrutiny." <u>Livestock Marketing</u>, 125
S. Ct. at 2058 (emphasis added). Because the Court answered that
question in the affirmative, and therefore rejected all of
respondents' First Amendment claims, it did not reach respondents'
separate freedom of association claims.

<u>Livestock Marketing</u> clearly establishes that when private
entities are enlisted to propagate generic advertising that is
governed by specific statutory constraints and overseen by the
Secretary, their expressive activity becomes that of the
government. <u>See</u> <u>Livestock Marketing</u> at 2062-63. It is well-
settled that the First Amendment offers no protection against
compelled association with government actors or the government
itself. <u>See</u> <u>Abood v. Detroit Board of Educ.</u>, 431 U.S. 209, 259
n.13 (1977)(Powell, J., concurring)("Compelled support of a private

association is fundamentally different from compelled support of government . . . a local board does not need to demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent."); see also Board of Regents of University of Wisconsin System v. Southworth, 529 U.S. 217, 229 (2000).

Consequently, because the promotional activities authorized by the Avocado Act constitute government speech, Plaintiffs have no valid freedom of association claim under the principles outlined in Livestock Marketing. Defendants are therefore entitled to summary judgment on this issue.

**B.**   **Summary Judgment Cannot Be Entered on Plaintiffs' As-Applied Free Speech Claim Until the Court Has a More Complete Record**

Even if the Avocado Act is facially valid, Plaintiffs claim that it is nonetheless unconstitutional as applied to them. They contend that "a considerable segment of the public attribut[es] the advertisements of Hass avocados to them" in violation of their First Amendment right to be free from compelled speech. See Pls.' Mot. for Summ. J. at 13-17. Before addressing the merits of this claim, however, the Court must address Defendants' argument that Plaintiffs failed to properly state it.

**1.**   **Plaintiffs properly raised an as-applied challenge to the Avocado Act**

Plaintiffs' Second Amended Complaint raises First Amendment freedom of speech claims generally but does not specifically

delineate the two separate legal theories it argues in the instant Motions: that the Act is unconstitutional on its face, or, alternatively, that it is unconstitutional as applied to them. <u>See</u> Second Am. Compl. at ¶¶ 51-58.   On that basis, Defendants argue that Plaintiffs violated Federal Rule of Civil Procedure 8 by failing to make a "short and plain statement" of their as-applied claim.   <u>See</u> Defs.' Mot. for Summ. J. at 19 n.2.   An "inarticulated supposition of a possible claim," they argue, is insufficient to satisfy modern pleading requirements.   Defs.' Reply at 8. Defendants therefore urge the Court to dismiss the as-applied claim pursuant to Rule 12(b)(6).

The Federal Rules of Civil Procedure create a system of "notice pleading" that is routinely described as "liberal." <u>See</u>, <u>e.g.</u>, <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 168 (1993); <u>see also</u> 2-12 Moore's Federal Practice - Civil § 12.34 (2005).   The Rules "do not require a claimant to set out the precise facts on which the claim is based" but instead only "a 'short and plain statement of the claim that will give the defendant notice of the . . . claim and the grounds upon which it rests.'" <u>Sinclair v. Kleindienst</u>, 711 F.2d 291, 293 (D.C. Cir. 1983)(citation omitted).   Complaints "'need not plead law or match facts to every element of a legal theory.'" <u>Sparrow v. United Airlines, Inc.</u>, 216 F.3d 1111 (D.C. Cir. 2000)(citation omitted).   Consequently, courts may only dismiss a complaint, or

elements thereof, if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

The Court finds Plaintiffs' Second Amended Complaint more than adequate under these principles.  The Complaint describes, at some length, the facts underlying Plaintiffs' claim that the Act violates their First Amendment right to freedom of speech.  It thus gives Defendants "fair notice" of Plaintiffs' claims and "the grounds upon which [they] rest." See Conley, 355 U.S. at 47.  Rule 8 requires nothing more.  Contrary to Defendants' suggestions, Plaintiffs were not obligated to separately plead their facial and as-applied challenges, which both arise from the same broad set of facts.  To require such specificity would violate both the letter of Rule 8 and the spirit of notice pleading.

## 2.   Defendants will be given an opportunity to conduct limited discovery

Plaintiffs base their as-applied claim on an attribution theory, arguing that even if the Avocado Act promotions are facially generic, they are often attributed specifically to them. See Pls.' Mot. for Summ. J. at 13-17.  In support of this contention, Plaintiffs hired a marketing consultant and statistician to conduct a survey gauging the likelihood that consumers will in fact attribute the avocado promotions to them. See Pls.' Mot. for Summ. J., Ex. B, Aff. of Robert Klein.

According to the survey, 34% of respondents, and 41% of likely avocado consumers, believed that one of the Plaintiffs was the source of the Avocado Act advertisements they had been shown. Id. ¶¶ 14-15. From this fact, Plaintiffs conclude that Avocado Act programs are "clearly attributed to Plaintiffs" and amount to unconstitutional compelled speech. See Pls.' Mot. for Summ J. at 17.

Plaintiffs' argument appears calculated to fit within a narrow exception left open in Livestock Marketing. Addressing respondents' as-applied challenge, Justice Scalia held that a "funding tagline . . . standing alone, is not sufficiently specific to convince a reasonable factfinder that any particular beef producer . . . would be tarred with the content" of the advertisements. Livestock Marketing, 125 S. Ct. at 2065-66. Nevertheless, he noted that the respondents might succeed in "an as-applied challenge – if it were established . . . that individual beef advertisements were attributed" to them. Livestock Marketing, 125 S. Ct. 2065. Likewise, Justice Thomas, in his concurrence, explained that "if the advertisements associated their generic pro-beef message with either the individual or organization respondents, then respondents would have a valid as-applied First Amendment challenge" because "the government may not . . . associate individuals or organizations individually with speech by attributing an unwanted message to them." Id. at 2066.

Given that Avocado Act promotions make no reference to individual avocado growers or importers, the Court has grave doubts that Plaintiffs can succeed on their as-applied claim.  See Irby Decl.  Livestock Marketing makes clear that a generic tagline, like those used in Avocado Act promotions, without more, is insufficient to raise the possibility of attribution.  See Livestock Marketing, 125 S. Ct. at 2065-66.  The fate of Plaintiffs' as-applied claim therefore turns on whether their survey, which purports to demonstrate that attribution occurs despite the generic nature of the promotions, even raises a concrete issue over a material fact in dispute which would warrant opening up this case to full-blown discovery and a possible trial.

To survive the pending summary judgment Motions, Plaintiffs must demonstrate that the survey provides enough evidence that a reasonable factfinder could return a judgment in their favor.  See Laningham, 813 F.2d at 1242.  The only evidence in this record is Plaintiffs' survey.  Accordingly, the Court must make a preliminary determination that the survey is reliable and trustworthy.  It is doubtful that the survey can meet the standards set forth in Judge Weinstein's textbook on the Federal Rules of Evidence.  See 5-901 Weinstein's Federal Evidence § 901.12(4)("[S]urvey results are hearsay, and must come within an exclusion or exception of the hearsay rule to be admissible. . . . For survey results to be admissible under the residual hearsay exception, they must meet

tests of necessity and trustworthiness; i.e., they must be more probative on the point in question than any other reasonably available evidence and must have circumstantial guarantees of trustworthiness that are equivalent to those of the other hearsay exceptions."). It is also doubtful that testimony regarding the survey could survive a <u>Daubert</u> examination and be admissible under Federal Rule of Evidence 702. <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993); Fed. R. Evid. 702.

Several of Defendants' criticisms of the survey's methodology seem well-founded. <u>See</u> Defs.' Opp'n at 12-15. The survey first required respondents to look at an Avocado Act promotion and then to read a complete list of Plaintiffs. Only then did respondents proceed to the question: "[D]o you believe that any of these companies was the source of the advertisement you just saw". <u>See</u> Pls.' Mot. for Summ. J., Ex. B, Klein Aff. ¶ 11. This format seems unnecessarily suggestive, and Defendants may be correct that it was "the survey itself, not the advertisement, that planted the seed of a possible connection between the advertisement and [P]laintiffs." Defs.' Opp'n at 14. A less suggestive survey might have yielded results that are significantly different, and significantly less favorable to Plaintiffs. Consequently, the Court is far from satisfied that the survey is reliable enough to enable a reasonable factfinder to find in Plaintiffs' favor on their as-applied claim.

The Government has asked, pursuant to Federal Rule of Civil

Procedure 56(f), to conduct limited discovery into the reliability and accuracy of Plaintiffs' survey.[10] That request will be granted in order to ensure that the record is as clear and complete as possible. Specifically, Defendants may take one deposition, as they requested, regarding the survey and may submit expert affidavits in opposition to Plaintiffs' expert.

## IV. CONCLUSION

For the foregoing reasons, the Intervenors' Motion to Dismiss or, in the Alternative, for Summary Judgment [Dkt. #71] is **granted in part and denied in part**, the federal Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment [Dkt. #73] is **granted in part and denied in part**, and Plaintiffs' Motion for Summary Judgment [Dkt. #74] is **denied**. The denial of Defendants' and Intervenors' Motions for Summary Judgment is without prejudice.

---

[10]     Defendants represented that they were unaware of Plaintiffs' survey until their Motion for Summary Judgment was filed and thus had no opportunity to test its validity or accuracy during discovery. See Defs.' Opp'n, Ex. 2, Forrest Decl. Because the resolution of Plaintiffs' as-applied claim turns on the validity of their survey, there is good reason to reopen discovery for this limited purpose.

An Order will issue with this Memorandum Opinion.


                                    /s/_____
March 15, 2006                      Gladys Kessler
                                    U.S. District Judge



**Copies to**: **attorneys on record via ECF**